IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

EDNA MADALENE CHAMBERS,     )
                                        )
           Plaintiff,        )
                                        )
          v.            )     Civil Action No.: 1:16cv609-WC
                                        )
NANCY A. BERRYHILL,          )
Acting Commissioner of Social Security,[1]   )
                                        )
          Defendant.      )

# MEMORANDUM OPINION

## I.    INTRODUCTION

Edna Madalene Chambers ("Plaintiff") filed applications for a period of disability

and disability insurance benefits and for supplemental security income on May 15, 2014.

Both applications alleged disability beginning on October 29, 2011.   The applications

were denied at the initial administrative level.  Plaintiff then requested and received a

hearing before an Administrative Law Judge ("ALJ").  Following the hearing, the ALJ

issued an unfavorable decision, and the Appeals Council denied Plaintiff's request for

review.  The ALJ's decision consequently became the final decision of the Commissioner

---

[1]  Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill shall be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

of Social Security ("Commissioner").[2] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The case is now before the court for review of that decision under 42 U.S.C. § 405(g). Pursuant to 28 U.S.C. § 636(c), both parties have consented to the conduct of all proceedings and entry of a final judgment by the undersigned United States Magistrate Judge. Pl.'s Consent to Jurisdiction (Doc. 8); Def.'s Consent to Jurisdiction (Doc. 7). Based on the court's review of the record and the briefs of the parties, the court AFFIRMS the decision of the Commissioner.

## II.    STANDARD OF REVIEW

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).[3]

To make this determination, the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011).

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific

---

[2]    Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

[3]    A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1 [the Listing of
Impairments]?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?
An affirmative answer to any of the above questions leads either to the next
question, or, on steps three and five, to a finding of disability. A negative
answer to any question, other than step three, leads to a determination of "not
disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The burden of proof rests on a claimant through Step Four. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004). A claimant establishes a *prima facie* case of qualifying disability once they have carried the burden of proof from Step One through Step Four. At Step Five, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id.*

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). *Id.* at 1238-39. The RFC is what the claimant is still able to do despite the claimant's impairments and is based on all relevant medical and other evidence. *Id.* It may contain both exertional and nonexertional limitations. *Id.* at 1242-43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant

---

[4] *McDaniel* is a supplemental security income (SSI) case. The same sequence applies to disability insurance benefits brought under Title II of the Social Security Act. Supplemental security income cases arising under Title XVI of the Social Security Act are appropriately cited as authority in Title II cases, and vice versa. *See, e.g.*, *Smith v. Comm'r of Soc. Sec.*, 486 F. App'x 874, 876 n.* (11th Cir. 2012) ("The definition of disability and the test used to determine whether a person has a disability is the same for claims seeking disability insurance benefits or supplemental security income.").

can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines ("grids"), *see* 20 C.F.R. pt. 404 subpt. P, app. 2, or call a vocational expert ("VE"). *Id.* at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. *Phillips*, 357 F.3d at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." *Id.*

The court's review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) ("Even if the evidence preponderates against the Commissioner's findings, [a reviewing court] must affirm if the decision reached is supported by substantial evidence."). A reviewing court may not look only to those parts of the record which support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

[The court must] . . . scrutinize the record in its entirety to determine the

reasonableness of the [Commissioner's] . . . factual findings. . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## III. ADMINISTRATIVE PROCEEDINGS

Plaintiff was forty-nine years old on the date of the hearing before the ALJ. Tr. 47. The highest grade Plaintiff completed was the ninth. Tr. 47. Following the administrative hearing, and employing the five-step process, the ALJ found at Step One that Plaintiff "has not engaged in substantial gainful activity since October 29, 2011, the alleged onset date[.]" Tr. 17. At Step Two, the ALJ found that Plaintiff suffers from the following severe impairments: "degenerative disc disease of the lumbar spine, osteoarthritis of the knees, obstructive sleep apnea, anxiety disorder, depressive disorder, hypertension, type II diabetes mellitus, and history of obesity." Tr. 21. At Step Three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" Tr. 21. Next, the ALJ articulated Plaintiff's RFC as follows:

the claimant has the residual functional capacity to perform light work . . . except that the claimant could stand and walk for four hours in a workday and sit six hours in a workday. The claimant would need the ability to occasionally change positions throughout the day for relief of postural discomfort. She can never climb ladders, ropes, or scaffolds. The claimant can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. She can occasionally perform pushing/pulling with the bilateral lower extremities. She should avoid concentrated exposure to temperature extremes and should avoid hazardous machinery and work at unprotected heights. The claimant can understand, remember and carry out simple, repetitive instructions and can persist at that level of complexity for eight

hours a day, five days a week consistently. She would need to avoid more than superficial or casual contact with the public. The claimant could have occasional interaction with co-workers and supervisors for non-collaborative work (defined as not being dependent on working in concert with others to achieve a desired outcome). She can adapt to routine changes in the work setting, but those changes would need to be gradually introduced.

Tr. 23. At Step Four, the ALJ concluded that Plaintiff "is unable to perform her past relevant work[.]" Tr. 31. However, the ALJ concluded at Step Five that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform[,]" including the representative occupations of "surveillance system monitor" and "plastic molding machine operator." Tr. 31-32. Accordingly, the ALJ determined that Plaintiff "has not been under a disability . . . from October 29, 2011, through the date of this decision[.]" Tr. 32.

## IV. PLAINTIFF'S ARGUMENT

Plaintiff presents one issue in her "Statement of the Issue," arguing that the ALJ's decision should be reversed because "the evidence does not support [Plaintiff's] ability to perform sustained work activities at the residual functional capacity as determined by the ALJ, on a regular and continuing basis." Pl.'s Br. (Doc. 11) at 4.

## V. DISCUSSION

Plaintiff argues that the ALJ failed to "appropriately assess the medical evidence" in the record, thus warranting reversal of the Commissioner's decision. *Id.* at 6. In particular, Plaintiff faults the ALJ for "fail[ing] to account for, or discredit[ing] parts of" various pieces of evidence, including her treating physician's opinion, a consultative

psychological examination, the opinion of the state agency consultant, and Plaintiff's use of a cane for ambulation. *Id.* at 7-9. Plaintiff argues that the ALJ's treatment of these various pieces of medical evidence violated SSR 96-8p, which states the Social Security Administration's "policies and policy interpretations regarding the assessment of residual functional capacity (RFC) in initial claims for disabilities benefits[.]" *See id.* at 6.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Medical opinions provided by treating sources are especially significant in the ALJ's RFC assessment. Absent "good cause," an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). Good cause to discount a treating physician's opinion exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). With good cause,

an ALJ may disregard a treating physician's opinion, but he "must clearly articulate [the] reasons" for doing so.  *Id.* at 1240–41.

In general, even as it relates to non-treating source opinions, the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam).  "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).  Therefore, when the ALJ fails to "state with at least some measure of clarity the grounds for his decision," a court will decline to affirm "simply because some rationale might have supported the ALJ's conclusion." *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) (per curiam).  In such a situation, "to say that [the ALJ's] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Cowart*, 662 F.2d at 735 (quoting *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979)) (internal quotation marks omitted). Nevertheless, if the ALJ's failure to properly explain the weight given to a particular medical opinion does "not affect its ultimate findings, the error is harmless, and the ALJ's

decision will stand." *Tillman v. Comm'r, Soc. Sec. Admin.*, 559 F. App'x 975, 975 (11th Cir. 2014) (quoting *Sharfarz*, 825 F. 2d at 279).

**A.    The ALJ's treatment of the opinion of Plaintiff's treating physician.**

Plaintiff first challenges the ALJ's treatment of the opinion of her treating physician, Dr. Gammill.  Dr. Gammill treated Plaintiff at Professional Medical Associates, a general care clinic where Plaintiff presented numerous times over the years for treatment of a variety of conditions, including sinus congestion and headache (Tr. 378, 363, 541, 506), hypertension (Tr. 375, 369, 363, 356, 408, 484), pain in her neck, back, and knees (Tr. 366, 363, 356, 408, 404, 531, 484, 469, 449, 434), anxiety (Tr. 408, 404, 484, 464), hot flashes and night sweats (Tr. 356, 541), excessive thirst and increased blood sugar (Tr. 520), nausea (Tr. 513), diarrhea (Tr. 513, 454), fatigue (Tr. 513), diabetes (Tr. 501, 484), heart palpitations and elevated heart rate (Tr. 497), weakness and dizziness (Tr. 494), depression (Tr. 474, 464), and her annual pap smear (Tr. 478).

The specific opinion evidence Plaintiff faults the ALJ for failing to fully credit consists of Dr. Gammill's completion of two forms provided by Plaintiff's counsel, a "Clinical Assessment of Pain" ("CAP") (Tr. 430) and a "Physical Capacities Evaluation" ("PCE") (Tr. 431).  On the former, Dr. Gammill was asked to give his clinical judgment about the extent to which Plaintiff's pain is present and limits her abilities.  Dr. Gammill opined that pain "is present to such an extent as to be distracting to adequate performance of daily activities or work[;]" that Plaintiff's performance of physical activities like "walking, standing, bending, stooping, [and] moving of extremities" would cause her to

experience "[g]realty increased pain and to such a degree as to cause distraction from tasks or total abandonment of task[;]" and the effects of Plaintiff's prescribed medications may cause some limitations to Plaintiff's ability to perform work, "but not to such a degree as to create serious problems in most instances." Tr. 430. On the latter form, Dr. Gammill was asked to rate the physical limitations on Plaintiff's ability to do work activities. Dr. Gammill opined that Plaintiff could lift only five pounds occasionally and one pound frequently during a normal workday; that Plaintiff may sit for one hour and stand or walk for one hour in an eight-hour workday; that Plaintiff requires an assistive device for ambulation; that Plaintiff can occasionally perform fine manipulations with her fingers, but that she can only rarely do activities including pushing and pulling with her arms and legs, climbing ladders or stairs, bending or stooping, reaching, being exposed to environmental pollutants like dust and pollen, and operating motor vehicles; and that she may never perform "gross manipulations" like grasping, twisting, and handling, and that she may never work with or around hazardous machinery. Tr. 431. Dr. Gammill also opined that Plaintiff would likely miss more than four days per month due to her impairments. Tr. 431. Where Dr. Gammill was asked to explain the basis for the many limitations he opined on the Physical Capacities Evaluation, he wrote the following: "[Patient] has chronic back and neck pain related to lumbar disc [illegible] with radiculopathy and C-T disc disease with radiculopathy. [Patient] also has clinical anxiety and depression." Tr. 431.

The ALJ reviewed and thoroughly summarized in her decision the treatment notes chronicling Dr. Gammill's and others' treatment of Plaintiff. Tr. 25, 26-28. The ALJ also

summarized the opinion evidence rendered by Dr. Gammill. Tr. 28. However, the ALJ only afforded Dr. Gammill's opinion "some weight" because the "extreme" pain-related limitations found by Dr. Gammill "are not well supported by the totality of the evidence[,]" and because, although Plaintiff's MRI "clearly shows back issues," "her treatment history in regards to her back and knees is inconsistent with Dr. Gammill's limitations." Tr. 30.

Plaintiff argues that the ALJ's stated reasons for failing to give Dr. Gammill's opinion controlling weight are insufficient because "the regulations clearly state a treating physician is entitled to controlling weight, and even if not given controlling weight, the ALJ must weigh all the necessary mitigating factors, citing specific evidence contradicting Dr. Gammill's opinion." Pl.'s Br. (Doc. 11) at 10 (citations omitted). However, in the ALJ's review of the evidence, the ALJ referenced several items of evidence tending to support her conclusion that the extreme limitations opined by Dr. Gammill were not "well supported." For example, the ALJ notes a February 9, 2012, examination by Dr. Obid where Plaintiff enjoyed "full range of motion [of her neck] without pain" and an "unremarkable" examination of her spine. Tr. 24 (citing Tr. 343-44). Likewise, the ALJ noted repeated "normal" physical examination findings by Dr. Gammill and others in 2013-2015. *See* Tr. 26-27 (citing Tr. 373, 367-68, 364, 360, 409-10, 405-06 [noting normal examination of neck and knees], 533). Furthermore, the ALJ noted instances in the record where Plaintiff indicated improvements in her experience of pain with medications or other treatments. *See* Tr. 26 (discussing Tr. 356, in which Plaintiff conveyed that her "bilateral knee pain is under control with current treatment regimen"), and Tr. 27 (discussing Tr. 449,

in which Plaintiff reported "pain in her neck and low back are improving with PT"). Where the ALJ has extensively reviewed and summarized the medical evidence, and has cited abundant evidence in the record, including from the treating physician's own treatment notes, tending to refute the treating physician's prognosis of extreme limitations, the court cannot conclude that the ALJ has failed in her duty to properly weigh the treating physician's opinion. Moreover, it is especially telling in this regard that, despite arguing that the ALJ failed in her obligation to properly support her conclusion that Dr. Gammill's opinion is not "well supported" by the record, Plaintiff cites to no evidence in the record tending to support the extreme limitations opined by Dr. Gammill. *See* Pl.'s Br. (Doc. 11) at 7, 9-10.

In addition, the ALJ properly relied upon Plaintiff's treatment history in according Dr. Gammill's opinion only some weight. Tr. 30. The ALJ summarized Plaintiff's largely conservative approach to seeking treatment for the pain that, according to Dr. Gammill, causes Plaintiff extreme limitations in her ability to do work activities:

> [T]he claimant complained of back and knee pain throughout the record, but did not get an MRI of the spine until September of 2015. Although she was advised to get an MRI of her left knee, she never did so. The claimant seemed to rely exclusively on pain medication, which tends to suggest that it was helpful to at least some degree. Surgical intervention was not sought. Her few sessions of physical therapy yielded some improvement, yet the claimant chose not to continue.

Tr. 29. Certainly, it is reasonable to expect a more aggressive treatment regimen where pain to the degree estimated by Dr. Gammill is present. At a minimum, one expects imaging of the affected areas would be promptly obtained to identify potential sources of

the pain in order to discern how better to treat it. Instead, Plaintiff mostly relied upon pain medication—namely, oxycodone—to treat her pain, as the record reflects that she was prescribed the medicine prior to March of 2012 and continued to have the prescription adjusted or refilled over the ensuing years to meet her needs. *See* Tr. 560-68. In addition, as the ALJ observed, Plaintiff also initially declined to receive an anti-inflammatory injection after injuring her left knee in August of 2014. Tr. 587. The ALJ also observed that Plaintiff partially met some of her goals of reducing pain with physical therapy, but that Plaintiff apparently abandoned that course of treatment. Tr. 28, 29 (discussing Tr. 416).

Although Plaintiff summarily argues that the ALJ improperly relied upon this conservative treatment in partially discrediting Dr. Gammill's opinion, Plaintiff points to nothing in the record tending to show that the treatment she sought and received was proportionate to the extreme limitations opined by Dr. Gammill. *See* Pl.'s Br. (Doc. 11) at 9-10. In any event, Circuit law has long established that a conservative course of treatment indicates that a claimant's pain is not disabling. *See, e.g., Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996). Furthermore, a course of conservative treatment can provide good cause for the ALJ's decision to discredit a treating physician's opinion. *See Peters v. Astrue*, 232 F. App'x 866, 871 (11th Cir. 2007) (affirming ALJ's decision to discredit treating source opinion where the ALJ had observed that treating physicians "followed 'conservative' courses of treatment and had noted that [claimant] had responded well to physical therapy and to anti-inflammatory injections"). Where Plaintiff availed herself of

and received a largely conservative course of treatment for her pain, substantial evidence supports the ALJ's decision to only partially credit her treating physician's opinion of extremely limiting pain.

After carefully and thoroughly reviewing all of the medical evidence in the record, the ALJ determined that the opinion of Plaintiff's treating physician that Plaintiff is extremely limited in her ability to do work activities because of her pain lacks substantial support in the record and is refuted by the largely conservative treatment Plaintiff received for her pain. As set forth above, the ALJ's resulting decision to only partially credit Plaintiff's treating physician's opinion is supported by substantial evidence in the record. As such, the ALJ did not reversibly err in her consideration of Plaintiff's treating physician's opinion.

## B.    The ALJ's treatment of the consultative examiner's opinion.

Plaintiff next argues that the ALJ "failed to properly weigh and consider the opinion of Dr. Randall Jordan." Pl.'s Br. (Doc. 11) at 10. Dr. Jordan, a licensed clinical psychologist, saw Plaintiff for a consultative psychological examination on May 31, 2012. Tr. 345-347. After a largely unremarkable mental status examination,[5] Dr. Jordan offered

---

[5]    In particular, the court notes the following observations by Dr. Jordan during his examination of Plaintiff: she was clean and neatly groomed and dressed appropriately; her speech was fully understandable and appropriate; affect was restricted but "congruent with mood," which Dr. Jordan described as "depressed but appropriate to situation;" she demonstrated intact concentration abilities and short and long-term memory abilities; she grasped abstract concepts without issue; and Dr. Jordan estimated Plaintiff's intelligence to be "in the Low Average range." Tr. 346. Under the heading "Psychiatric," Dr. Jordan further observed "no loose associations or tangential thought;" no paranoid delusions; no hallucinations; no compromised judgment, "as the claimant was able to state appropriately how to respond to common social situations such as what to do in case of a fire and why we wear seatbelts, etc.;" and fair insight into Plaintiff's current functional

several conclusions about Plaintiff's functional abilities, including, in relevant part, the following: Plaintiff "can manage [her] financial affairs in a manner consistent with same age peers;" Plaintiff "can function independently;" Plaintiff "can hear and understand normal conversation without great difficulty;" and Plaintiff can "carry out and remember instructions of a simple, one-step nature" and "can do multi-step tasks with some degree of supervision." Tr. 347. However, Dr. Jordan also opined that Plaintiff's "ability to respond well to coworkers, supervision, and everyday work pressures is compromised to a moderate to severe degree due to psychiatric issues." Tr. 347. He also concluded that "[p]hysical issues are also a primary limiting factor[,]" and opined that "[c]ontinued psychiatric and medical care is needed." Tr. 347.

The ALJ reviewed and thoroughly summarized Dr. Jordan's report. Tr. 28-29. Ultimately, the ALJ determined that "Dr. Jordan's opinion merits only some weight" because, while "[m]ost of his limitations appear consistent with his examination," "his statement suggesting up to a severe degree of social limitation is not supported by his examination and appears to be based on claimant report only." Tr. 30.

Plaintiff argues that the ALJ was required to give a "clear rationale as to why" she partially discredited Dr. Jordan's opinion and cite "specific medical evidence contradictory to the ALJ's residual functional capacity." Pl.'s Br. (Doc. 11) at 10. She further asserts

---

problems. Tr. 346. Finally, Dr. Jordan found that Plaintiff's activities of daily living "are not limited" and that her "Daily Living Skills" are not compromised by intellectual function, but that Plaintiff's reported "anxiety attacks" and "physical function" might sometimes interfere with her ability to perform such skills. Tr. 346.

that "Dr. Jordan is an examining physician, who is a specialist in the field of psychiatry, whose opinion was further bolstered" by other medical source opinions in the record. Pl.'s Br. (Doc. 11) at 11.

First, it is clear that Dr. Jordan, a clinical psychologist operating with a doctorate in psychology, *see* Tr. 347, is not a physician or a psychiatrist, as apparently believed by Plaintiff. More importantly, however, and contrary to Plaintiff's argument, the ALJ did weigh Dr. Jordan's opinion and gave a clear rationale for her decision to give it only some weight. As discussed above, Dr. Jordan's examination of Plaintiff rendered mostly normal, ordinary findings. Thus, to the extent that Dr. Jordan opined any "severe" degree of compromise to Plaintiff's "ability to respond well to coworkers, supervision, and everyday work pressures," the ALJ reasonably concluded that such conclusion must be based largely on Plaintiff's self-reporting. This was no doubt problematic, in the ALJ's view, because the ALJ determined that Plaintiff's allegations respecting her mental impairments were not fully credible for a host of reasons including her lack of specialized mental health treatment, contradictory medical records, and her own reports of her daily activities. Tr. 30. Notably, Plaintiff has not challenged the ALJ's findings with respect to her own credibility.

Furthermore, while weighing Dr. Jordan's May 2012 report, the ALJ had the benefit of more than three years' worth of subsequent medical records pertaining to Plaintiff's psychological functioning. As recognized by the ALJ and argued by Defendant, these records reveal a continued conservative course of mental health treatment based on largely

normal examination findings. *See, e.g.,* Tr. 376 (October 23, 2012 – noting normal psychiatric examination), 373 (February 26, 2013 – same), 369-70 (April 25, 2013 – same), 368 (May 14, 2013 – same), 363-64 (November 13, 2013 – no complaint of anxiety or other psychiatric issues and noting normal psychiatric examination), 359-60 (April 1, 2014 – no complaint of anxiety or other psychiatric issues and noting normal psychiatric examination) 356-58 (May 14, 2014 – Plaintiff denied "feelings of depression, excessive anxiety, confusion, or irritability" and normal psychiatric examination noted), 408-10 (July 23, 2014 – follow-up for, *inter alia*, anxiety disorder where Plaintiff reports "doing well" with "no current complaints" and noting normal psychiatric examination), 406 (August 12, 2014 – noting normal psychiatric examination), 541-43 (November 12, 2014 – noting complaint of "depression and irritability," but normal psychiatric examination). 533-34 (January 13, 2015 – no complaints of anxiety and noting normal psychiatric examination), 526 (January 28, 2015 – noting normal psychiatric examination), 522 (February 4, 2015 - same), 515 (February 18, 2015 – same), 503 (March 12, 2015 – same), 508 (April 2, 2015 – same), 499 (April 14, 2015 – same), 496 (May 14, 2015 – same), 484-86 (June 15, 2015 – noting complaint of increased anxiety due to recent death of mother, but further noting normal psychiatric examination), and 469-71 (July 7, 2015 – no additional complaints of anxiety or other psychiatric symptoms, and noting normal psychiatric examination). Moreover, although Plaintiff complained of more severe anxiety issues in early August of 2015, *see* Tr. 464, and was thus prescribed a new antidepressant and a psychiatric referral, *see* Tr. 467, at her later visit to Professional Medical Associates that same month she did

not complain of continued or additional anxiety or depression-related problems. *See* Tr. 449. Finally, while Plaintiff reported "uncontrolled" anxiety with several panic attacks daily in September of 2015, was noted to have an appointment with a psychiatrist for that same week, and was instructed to keep that appointment (*see* Tr. 434-38), the record does not contain any treatment records from this appointment. If Plaintiff failed to keep this appointment, then the ALJ was justified in relying upon the conservative treatment Plaintiff sought for her mental health issues, as well as Plaintiff's failure to obtain specialized treatment for such issues, in discounting Dr. Jordan's opinion.

In sum, the ALJ had little to go on with respect to assessing the severity of Plaintiff's anxiety and other mental health issues except for Plaintiff's own reporting of her symptoms, which, as discussed above, the ALJ found less than fully credible. Because, as found by the ALJ, Dr. Jordan relied heavily upon Plaintiff's report of the severity of her issues in formulating his opinion, the ALJ cited sufficient justification for giving Dr. Jordan's opinion only some weight.

C.    **The ALJ's treatment of the opinion of the state agency consultant.**

Plaintiff next appears to argue that the ALJ erred in her consideration of the opinion of the state agency medical consultant, Dr. Estock. Pl.'s Br. (Doc. 11) at 11. Dr. Estock completed a Disability Determination Explanation, which included a Mental Residual Functional Capacity Assessment ("MRFCA"), on June 1, 2012. Tr. 89-102. In the MRFCA, Dr. Estock opined that Plaintiff has "sustained concentration and persistence limitations," including moderate limitations in her abilities to "carry out detailed

instructions," "work in coordination with or in proximity to others without being distracted by them," and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Tr. 99. By way of explanation, Dr. Estock opined as follows:

> Claimant is able to carry out short and simple instructions and attend and concentrate for 2 hour periods on simple tasks with customary breaks and rest during the regular workday. Claimant may benefit from a flexible schedule. Claimant may miss 1-2 days a month of work due to psychiatric signs and symptoms . . . Claimant would function best with his/her own work area/station without close proximity to others.

Tr. 99.

The ALJ noted the limitations opined by Dr. Estock, Tr. 28, but also noted that, in a subsequent psychiatric review technique completed by Dr. Estock in August of 2014, Dr. Estock found only mild difficulties in maintaining social functioning and no difficulties in maintaining concentration, persistence, or pace. Tr. 29 (discussing Tr. 126, 138). Comparing Dr. Estock's disparate opinions from 2012 and 2014, the ALJ ultimately resolved to give his opinion only some weight. Tr. 30. She found that Dr. Estock's "findings from 2014 showing that the claimant's mental limitations are non-severe are inconsistent with diagnoses, medication, and the claimant's subjective complaints[,]" while his "2012 conclusions are more consistent with medical evidence of record[.]" Tr. 30. Nevertheless, the ALJ discredited Dr. Estock's 2012 opinion that Plaintiff would be

expected to miss one to two days of work per month due to of "psychiatric symptoms" because such opinion is "vague and not well supported." Tr. 30.

Plaintiff appears to assert that the ALJ's treatment of that portion of Dr. Estock's 2012 opinion which she did not fully credit was erroneous because "Dr. Estock is a regular member of the panel of specialists utilized by the Social Security Administration to evaluate claims, and has a greater understanding of the rules and regulations of Social Security disability and the evidentiary requirements." *Id.* Plaintiff does not explain why the ALJ should have accepted all of Dr. Estock's 2012 opinion while disregarding his 2014 opinion. Certainly, Dr. Estock was just as much a "regular member of the panel of specialists utilized by the Social Security Administration" in 2014 as he was in 2012. Indeed, it is difficult to see the logic in Plaintiff's apparent argument that a reviewing physician's earlier, more favorable, opinion about a condition should trump a subsequent, less favorable opinion based upon additional evidence. In any event, the ALJ considered Dr. Estock's multiple opinions, weighed them, and gave clear reasons for partially discrediting Dr. Estock's opinion that Plaintiff would miss one to two days of work per month due to psychiatric symptoms. Those reasons—that the opinion is vague and not well supported by the record—are, as demonstrated in the above description of the evidence relating to the ALJ's treatment of Dr. Jordan's opinion, supported by substantial

evidence in the record.  Accordingly, the ALJ did not err in her treatment of the state agency consultant's opinion.

**D.  The ALJ's treatment of evidence of Plaintiff's use of an assistive device.**

Plaintiff's final argument is that the ALJ "failed to account for [her] use of an assistive device in her residual functional capacity."  Pl.'s Br. (Doc. 11) at 11.  She asserts that "[a]n individual who requires the use of a cane for even minimal ambulation would not be able to perform the standing, walking and lifting required for the performance of light work."  *Id.* at 12.

Plaintiff testified before the ALJ that she has twice been prescribed a cane by a doctor, including, in the last instance, Dr. Gammill.  Tr. 53-54.  She testified that the cane helps to stabilize her legs when they feel numb due to neuropathy.  Tr. 54.  Although Plaintiff testified that she was prescribed the cane, Plaintiff points to no evidence in the record showing that, indeed, the cane was prescribed by a doctor.  *See* Pl.'s Br. (Doc. 11) at 9, 11-12.  Rather, Plaintiff cites to her own function report and a third-party function report, as well as her testimony before the ALJ, to demonstrate her need for the cane. Although there are several mentions in the medical record of Plaintiff using a cane, the closest Plaintiff comes to showing that she was prescribed the cane is Dr. Gammill's affirmative answer to the question, on the PCE discussed previously, whether Plaintiff "require[s] an assistive device . . . to ambulate even minimally in a normal workday."  Tr. 431.  If the record does not evince an actual prescription for a cane—and, again, Plaintiff points to nothing more concrete than Dr. Gammill's PCE—then it is doubtful that the ALJ

was required even to consider Plaintiff's need for a cane in the RFC. *See* SSR 96-6P ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking, standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).").

In any event, Plaintiff has not shown that any error by the ALJ for failing to account for Plaintiff's use of a cane in the RFC is anything more than harmless error. By incorporating what is essentially a sit/stand option into Plaintiff's RFC—the ALJ found that Plaintiff "would need the ability to occasionally change positions throughout the day for relief of postural discomfort" and later characterized this limitation as a "sit/stand option," *see* Tr. 23, 32—the ALJ "expressly limited the available jobs to those permitting constant access to a chair." *Moore v. Comm'r of Soc. Sec.*, 478 F. App'x 623, 624 (11th Cir. 2012) (rejecting argument that ALJ reversibly erred in failing to account for medical evidence concerning claimant's use of a cane where ALJ found claimant could perform light work (including "small-products assembly") with a sit/stand option). Here, the ALJ queried the vocational expert whether the two occupations he identified, surveillance system monitor and plastics molding machine operator, "would both afford one the opportunity to be able to stand and walk for four or sit for four and basically change positions occasionally as needed?" Tr. 65. The VE responded in the affirmative as to both, testifying that "[s]omebody would be up and down continuously throughout the day"

performing such jobs. Tr. 65. Hence, by including the additional requirement of the sit-stand option, the ALJ's RFC sufficiently embraced Plaintiff's need for a cane—assuming such was medically necessary—and the ALJ's failure to separately account for the use of the cane in the RFC was not reversible error. *Moore*, 478 F. App'x at 624.

Finally, Plaintiff cites to no authority for her argument that "the use of a cane for even minimal ambulation" is inconsistent with "the performance of light work." Pl.'s Br. (Doc. 11) at 12. Indeed, courts have often found that persons are capable of light, and even medium, work despite the need for an assistive device like a cane. *See, e.g., Freeman v. Comm'r, Soc. Sec. Admin.*, 593 F. App'x 911, 916 (11th Cir. 2014) (affirming ALJ's reliance on VE testimony about availability of jobs at medium and light exertional levels where ALJ's hypothetical included use of a cane). In any event, as discussed above, the ALJ found that Plaintiff is incapable of performing the full range of light work due, in part, to her limitations requiring the need to "occasionally change positions throughout the day for relief of postural discomfort." Tr. 23. However, the VE testified that such limitation does not preclude the performance of light and sedentary jobs existing in significant numbers in the national economy. Tr. 64-65. Thus, Plaintiff's argument that the use of a cane is inconsistent, generally, with the performance of the full description of light work is irrelevant. Substantial evidence in the record—i.e., the VE's testimony that there are

jobs available to Plaintiff despite her need for a sit/stand option—supports the ALJ's decision that Plaintiff is not disabled despite any purported need for a cane to ambulate.

## VI.      CONCLUSION

For all of the reasons given above, the undersigned Magistrate Judge concludes that the decision of the Commissioner is AFFIRMED.  A separate judgment will issue.

Done this 4th day of August, 2017.

/s/ Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE